**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                          No. 94-5903

CHARLES L. GROVER,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                          No. 94-5937

CHRISTOPHER HARRIS,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                          No. 95-5096

CHARLES DORSEY,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge.
(CR-93-228-L)

Argued: November 3, 1995

Decided: May 6, 1996

Before MICHAEL and MOTZ, Circuit Judges, and PHILLIPS,
Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Denise Charlotte Barrett, Assistant Federal Public Defender, Baltimore, Maryland; Harry D. McKnett, Columbia, Maryland; Donald Henry Feige, Baltimore, Maryland, for Appellants. Thomas Michael DiBiagio, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** James K. Bredar, Federal Public Defender, Martin Bahl, Staff Attorney, Baltimore, Maryland, for Appellants. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Defendants Charles Dorsey, Charles Grover, and Christopher Harris were tried together and convicted of conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846. Dorsey was also convicted of distribution of crack cocaine in violation of 21 U.S.C. § 841. Defendants appeal their convictions on numerous grounds, and defendant Grover also appeals his sentence. For the following reasons, we affirm in all respects.

I.

The indictment charged the defendants (along with Kenny Dorsey, who remains a fugitive) with participating in a conspiracy to distribute crack cocaine in Maryland from September 1991 to July 1993. The evidence presented at trial showed that Kenny Dorsey was responsible for multiple shipments of cocaine (totalling eighty kilo-

2

grams) from California to Maryland. Charles Dorsey (nephew of Kenny) served as the "distribution point" in Maryland. Charles Grover acted as a courier on three shipments (totalling eight kilograms). The Dorseys supplied Tracy Washington with the cocaine. Washington, along with Michael Walker, would sell distributable quantities to various individuals including Christopher Seymour, Johnny Johnson, Darius Bevins, and defendant Christopher Harris.

In April 1992 police arrested Seymour who, in turn, implicated Walker. In May 1993 police arrested Walker, and he agreed to act as a confidential informant. Walker made two purchases of crack cocaine from Charles Dorsey and Washington; the purchases were recorded on video tape. Also, Walker recorded conversations with Charles Dorsey and Washington.

While no video or recordings were made of Grover or Harris, in June 1993 Harris (who was a mailman) was driving a car in which Washington was a passenger when the Government recorded a telephone conversation between Washington and Walker concerning drugs. During the conversation, Walker asked Washington if he had the "mailman" with him and Washington responded that he did. Washington and Walker then joked about how "Chris" (i.e., Christopher Harris) drives like a mailman. In a second conversation between Walker and Washington, recorded in July 1993, Washington told Walker that he was trying to get rid of "three dirt bikes." Walker replied: "Give it to the post office." Washington then stated: "[he] or [they] already holding." According to trial testimony, "dirt bikes" referred to cocaine, "post office" meant Christopher Harris, and "already holding" meant that Harris already had some cash or cocaine. Also, there was evidence showing multiple telephone calls and pager activations from Washington to Harris.

As for Grover, motel, credit card, telephone, and car rental records confirm that he was in the Baltimore area at the time he was alleged to have delivered cocaine from California.

In July 1993 the police arrested Washington, Johnson, and Bevins. All three agreed to act as cooperating witnesses in exchange for reduced sentences.

3

In August 1993 Charles Grover was arrested at the Ontario, California, airport. In Grover's suitcase police found pillows, fabric softener,[1] and approximately $154,000 in cash, which was wrapped in plastic with rubber bands. During a search of Grover's home, the police found guns, ammunition, and other suitcases containing pillows and fabric softener. (The parties refer to this evidence as the "California evidence.")

At trial Walker claimed that he and Washington would deliver distributable quantities of crack cocaine to Harris. According to Walker, he would drop off cocaine with Harris and collect cocaine debts. And, when initially debriefed in May 1993 by Special Agent Jeffrey Silk of the Drug Enforcement Agency, Walker stated that Washington would distribute cocaine to a postal worker, though Walker did not expressly mention Harris by name. Walker did not, however, know where and to whom Harris was allegedly selling the cocaine.

In addition, Walker testified that on several occasions from the spring through the fall of 1992, he met drug couriers at motels in the Baltimore area. The couriers, including Charles Grover, would deliver cocaine coming from Kenny Dorsey in California. Charles Dorsey monitored shipments from California to Maryland and handled the money sent back to California. Walker described six shipments that arrived in 1992 and said that Charles Dorsey and Charles Grover were involved in these shipments.

Washington testified that Harris purchased cocaine from him on consignment, at first buying an ounce a month, and later taking 4 1/2 ounces per month. Washington also testified that he would meet Harris at a car wash or send Walker to deliver the cocaine. Washington, like Walker, did not know what Harris did with the cocaine.

Washington testified that he purchased drugs from Kenny Dorsey and identified Charles Dorsey and Charles Grover as persons involved in distribution.

_____

[1] Evidently, drug traffickers often use fabric softener to help disguise the smell of contraband.

4

Johnny Johnson testified that he purchased cocaine from Charles Dorsey. Darius Bevins testified that he would meet Washington at the car wash to purchase drugs. Bevins said he saw Harris meet with Washington at the car wash, though Bevins was unable to say that he saw Harris buy or possess drugs.

The jury convicted the defendants. At sentencing, Charles Dorsey received 235 months imprisonment; Charles Grover received 151 months; Christopher Harris received 78 months. This appeal followed.

II.

Defendants Grover and Dorsey claim that the district court erred when it allowed the Government to introduce the "California evidence" over defendants' objection as substantive evidence of the charged conspiracy. Again, such evidence includes $154,000 seized from Grover at the Ontario Airport, the materials Grover used in his attempt to hide the money (e.g., pillows and fabric softener), and the firearms and ammunition found at Grover's home.

The defendants argue that the California evidence is not relevant under Rule 401 of the Federal Rules of Evidence and therefore not admissible under Rule 402 because it was seized in August 1993, a month after the charged conspiracy ended, and was unrelated to the drug trafficking activities that transpired in Maryland. The defendants also argue that even if the evidence is admissible under Rule 402, the court should have excluded the evidence under Rule 403, which gives the court discretion to exclude evidence when its probative value will be substantially outweighed by the danger of unfair prejudice. The defendants further argue that even if the evidence was admissible, it was only admissible as "other crimes" evidence under Rule 404(b) and that the district court's failure to give a limiting instruction under Rule 105 constitutes reversible error.

We review the decision of a district court to admit evidence for "abuse of discretion." United States v. Gravely, 840 F.2d 1156, 1162 (4th Cir. 1988). The indictment in this case charged a conspiracy to distribute crack cocaine "[f]rom on or about September of 1991, through in or about July of 1993, in the State and District of Maryland

5

. . . ." Because the California evidence was seized in August of 1993, the seizure clearly occurred after the charged conspiracy concluded. Moreover, the Government did not argue to the district court, nor did it argue to this court, that the money seized was proceeds of the drug trafficking activities in Maryland.

Rather, the Government's theory is that the California evidence was properly admitted because the conspiracy charged in the indictment was part of a larger and more extensive narcotics conspiracy involving Kenny Dorsey and Charles Grover. This larger conspiracy continued past July of 1993 and involved narcotics trafficking throughout the United States. In addition, the California evidence was admissible because it corroborated the testimony of Walker and Washington that Grover acted as a drug courier for Kenny Dorsey during the course of the conspiracy charged in the indictment.

We hold that it was not an abuse of discretion to admit the California evidence as substantive evidence of the crime charged. While Rule 402 prohibits the introduction of evidence that is not relevant, Rule 401 provides that "`[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Government therefore could introduce evidence that had any tendency to show the existence of the charged conspiracy and evidence that had any tendency to show Grover's role in that conspiracy.

The California evidence did both those things. It placed the charged conspiracy in the context of the larger conspiracy of which the charged conspiracy was a component part. Likewise, it buttressed the testimony of Walker and Washington that established Grover's role in the conspiracy, because it showed that Grover acted as a drug courier in a larger conspiracy which included Grover's trafficking activities in Maryland. See, e.g., United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994) ("evidence of uncharged conduct is not considered `other crimes' evidence if it arose out of the same series of transactions as the charged offense, . . . or if it is necessary to complete the story of the crime on trial") (citation and internal quotes omitted), cert. denied, 115 S. Ct. 939 (1995). Thus, the California evidence was admissible.

6

We also hold that it was not an abuse of discretion for the district court to refuse to exclude the California evidence under Rule 403.**2** That rule is concerned with evidence that is <u>unfairly</u> prejudicial. Here, the Government does not run afoul of Rule 403. As we have already said, the California evidence helped place the charged conspiracy in the context of the larger conspiracy of which the charged conspiracy was a component part.

Furthermore, because we hold that the evidence was admissible to prove the existence of the conspiracy charged in the indictment, the California evidence is not "other crimes" evidence within the meaning of Rule 404(b). <u>See Kennedy</u>, 32 F.3d at 885. No limiting instruction under Rule 105 was therefore necessary.**3**

---

**2** Rule 403 provides that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**3** Grover also claims that the district court erred when it denied his prior motion to suppress the California evidence. That claim is meritless. As an initial matter, Grover has a standing problem; at the suppression hearing he denied that he owned the suitcase containing the money. Accordingly, he cannot challenge the Government's search and seizure of the evidence. In addition, even if Grover has standing, there was ample evidence establishing probable cause to detain and arrest Grover and for the issuance of a warrant to search the suitcase. In particular, the police had been notified that there was a suspected narcotics trafficker (an R. Green) on Grover's plane; Los Angeles Police Department records revealed that an individual by the name of "R. Green" was suspected of heroin smuggling; Grover was sitting in the seat assigned to R. Green; Grover matched the description of R. Green; and Grover's $1200.00 airline ticket had been purchased in cash. Also, when the police approached Grover (but before he was arrested), the police could smell the odor of fabric softener, which is used by drug couriers to conceal other smells; Grover stated that he did not possess an airline ticket; Grover did not have identification that matched his seat assignment or the tag on the suitcase; a check of computer records showed that Grover was a suspected drug trafficker; and a narcotics dog alerted on the suitcase. After the police obtained a search warrant and opened the suitcase, they found

7

III.

Christopher Harris contests his conviction on three grounds. He claims that the district court abused its discretion when it denied his request to introduce evidence showing that Tracy Washington had previously been involved in a drug transaction with a postal employee other than himself. Harris also claims, along with Grover and Dorsey, that during closing argument to the jury the prosecutor impermissibly vouched for the credibility of the Government's chief witnesses by expressly stating that the witnesses' testimony was truthful. While defense counsel failed to object to the prosecutor's vouching at the time the statements were made, the defendants argue that the prosecutor's vouching constitutes plain, reversible error. Finally, Harris claims that the district court erred when it refused to instruct the jury that a mere buyer-seller relationship does not constitute sufficient evidence to support a conviction for conspiracy to distribute narcotics.

As discussed below, we find that the district court did not abuse its discretion when it excluded proffered testimony that Washington dealt drugs with a postal employee other than Harris, and we further reject the claim that Harris was entitled to the buyer-seller instruction under the circumstances presented here. As for the claimed vouching, while we think that it is clear that the prosecutor's remarks were improper and not to be countenanced, we hold that in light of the entire proceedings the remarks were not so prejudicial as to undermine the trial's fundamental fairness with respect to any of the defendants. We therefore conclude that the remarks do not constitute reversible error.

_____

approximately $154,000 in cash; the cash was bound in bundles with rubber bands and wrapped in numerous scented fabric softener sheets. Based on the police detectives' training, knowledge, and experience, they believed that such packaging reflected a method used by individuals in drug trafficking to transport drug proceeds. They then arrested Grover. Given these facts, the district court did not err when it refused to suppress the California evidence.

8

A.

The direct evidence linking Harris to the charged conspiracy included (1) the June 1993 and July 1993 audio tapes of conversations between Washington and Walker with their references to "mailman," "post office" and "dirt bikes" and (2) the testimony of Washington and Walker concerning Harris's participation in the charged conspiracy. At trial, both Washington and Walker testified that "post office" meant Harris, and, on direct examination by the prosecution, Washington testified that he was not dealing drugs with any mailman other than Harris. Also, while Walker failed to identify Harris by name in his initial debriefings with the DEA after his arrest in May 1993, Walker stated that Washington dealt drugs to a mailman.[4]

Throughout trial Harris's defense was that he was completely innocent of any drug dealings with Washington and Walker. To establish that Harris was not the "post office" and to impeach Washington and Walker, counsel for Harris sought to introduce evidence that another postal employee, Moses Norfleet, had brokered a drug deal for Washington in June 1991, a few months prior to the time the charged conspiracy commenced. Evidently, Norfleet had arranged for Washington to sell a distributable quantity of cocaine to Troy Sneed.

Defense counsel first attempted to elicit testimony from Washington on cross-examination that he knew Norfleet. Washington denied knowing Norfleet. Next, defense counsel attempted to show that Norfleet was a postal employee and that Norfleet had brokered a sale of cocaine for Washington. The latter was to be established through the testimony of Police Detective Edward J. Fox, Jr. of the Baltimore City Police Department. Detective Fox had arrested Washington in connection with the sale.

The district court denied defense counsel's request to introduce the testimony of Detective Fox because (1) the prosecution had not introduced evidence connecting Harris to the transaction with Norfleet; (2) at most, the evidence was impeachment to show that Walker was talk-

_____

[4] When Special Agent Silk of the DEA debriefed Walker in May 1993, he surmised that Harris was the mailman to whom Walker was referring because there were records of multiple telephone calls between Harris and Washington.

ing about Norfleet when he was first debriefed; and (3) the issue was actually brought into the case through the cross-examination of Walker. Thus, according to the district court, the evidence was irrelevant and improper impeachment.

Again, we review the district court's decision to admit (or exclude) evidence for abuse of discretion. Moreover, while the Constitution guarantees a defendant "the right to put before a jury evidence that might influence the determination of guilt," Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987), such evidence must be both relevant and admissible. United States v. Powers, 59 F.3d 1460, 1470 (4th Cir. 1995), cert. denied, 116 S. Ct. 784 (1996).

The evidentiary issue presented here raises questions involving dual relevancy, impeachment evidence, and collateral evidence. As we have explained, evidence is relevant under Federal Rule of Evidence 401 if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence has dual relevance if it admissible for more than one purpose. Therefore, when such evidence is inadmissible for one of its intended purposes, that fact does not necessarily render the evidence inadmissible for the other purpose. For example, while extrinsic evidence offered to impeach the credibility a witness is inadmissible under Federal Rule of Evidence 608(b),[5] if such evidence is also relevant and admissible for some other purpose, then it may be introduced. See, e.g., United States v. Abel, 469 U.S. 45, 56 (1984) ("It would be a strange rule of law which held that relevant, competent evidence which tended to show bias on the part of a witness was nonetheless inadmissible because it also tended to show that the witness was a liar.");

_____

[5] Rule 608(b) provides in pertinent part:

> (b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness . . . .

United States v. Smith Grading and Paving, Inc., 760 F.2d 527, 531 (4th Cir.) ("Rule 608(b) should not be read so broadly as to disallow the presentation of extrinsic evidence that is probative of a material issue in a case."), cert. denied, 474 U.S. 1005 (1985).

While falling within Rule 608(b), impeachment by contradiction is evidence that has dual relevance. It is offered not only to impeach the credibility of a witness but it is also offered to prove some material fact at issue in the case, or it is independently admissible to impeach by showing such things as bias. See 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 608[05], at 608-50 to 608-54 (1995) (commenting that "[c]ounsel and courts sometimes have difficulty in distinguishing between Rule 608 impeachment and impeachment by contradiction"). District courts should, however, exclude extrinsic evidence which seeks to impeach by contradiction when the fact that the evidence supports or undermines is collateral or irrelevant to the material issues in the case. See, e.g., United States v. Koziniski, 16 F.3d 795, 805-07 (7th Cir. 1994) (finding no abuse of discretion when district court excluded extrinsic evidence that attempted to provide background information on drug conspiracy when true purpose of evidence was to show that witness was a liar); United States v. Phillips, 888 F.2d 38, 41-42 (6th Cir. 1989) (finding no abuse of discretion when district court excluded extrinsic evidence showing bias of Government witnesses because evidence involved a remote matter unrelated to the charges against the defendant); United States v. Ling, 581 F.2d 1118, 1120-21 (4th Cir. 1978) (reversible error for district court to admit extrinsic evidence that was collateral to the charges upon which the defendant was accused and which was offered to attack the credibility of the defendant). See also United States v. Tate, 715 F.2d 864, 865 n.2 & 866 (4th Cir. 1983) (reversible error for district court to admit extrinsic evidence that defendant possessed a different gun on a previous occasion because such evidence was not relevant to issue of whether defendant knew he was carrying guns in the trunk of his wife's car).

Here, to the extent that defense counsel sought to introduce the testimony of Detective Fox in order to impeach the credibility of Washington and Walker, Rule 608(b) clearly precludes its admission. While defense counsel was free to ask both Washington and Walker on cross-examination whether they had dealt with postal employees

11

other than Harris in an attempt to undermine their credibility, once Washington and Walker testified to the contrary, defense counsel could not introduce extrinsic evidence solely for the purposes of impeachment. Indeed, so long as the proffered testimony of Detective Fox involved matters collateral or irrelevant to the material issues in the case, the district court could exclude such testimony even though the Government had asked Washington on direct examination if he had dealt with mailmen other than Harris.

Accordingly, we must answer whether the testimony of Detective Fox is relevant for the purpose of showing that when Washington and Walker discussed giving drugs to the "post office" in July 1993, they meant someone other than Harris. Likewise, we must answer whether such evidence is relevant for purposes of showing that when Walker mentioned a postal worker in his initial debriefings in May 1993, he meant someone other than Harris.

As to both these questions, we are dealing with material issues in the case. In fact, the district court did not rule that these questions raise collateral matters. And given the emphasis that the prosecution placed on the tape recording at trial, it would be nonsensical (and inconsistent) to argue that identification of the"post office" was a collateral matter.

We are thus left with a pure issue of relevancy and that is an issue to which we must accord the district court's decision particular deference. See Powers, 59 F.3d at 1470. The transaction involving Washington and Norfleet occurred approximately two years prior to both the taped conversations between Washington and Walker and Walker's initial debriefing with the DEA. Moreover, the transaction occurred prior to the time that Washington became involved in Kenny Dorsey's drug enterprise, and there is no contention made that the transaction had anything whatsoever to do with the charged conspiracy. The latter fact distinguishes the issue presented here from the one presented in Part II, supra. Accordingly, given the deference that we must accord the district court's evidentiary rulings, we cannot say that the district court abused its discretion.

B.

Defense counsel also attempted to attack the credibility of Washington, Walker, and other Government witnesses by drawing the

12

jury's attention to the various plea agreements entered into with the Government. Cross-examination of this kind is, of course, entirely proper and expected. Equally proper is the Government's right to establish a witness's credibility in the face of such an attack. However, in a part of his closing argument to the jury, the prosecutor overstepped his bounds and told the jury that:

> I am going to make a pitch to the judge at sentencing. They testified truthfully, they upheld their end of the bargain, and I am going to uphold my end of the bargain. I respect that. Somebody that is willing to do that, I think that they should get something from me and they are. I am not hiding that from you.

* * * *

> You can talk about the evidence in a case like this, you get your head hanged (sic) to you. Best thing to do[if you are the defense] is circle it, attack the people, attack the drug dealers, they are bad, they are bad, they are bad. I am telling you they are bad, but they are not liars. Too much to lose to lie.

* * * *

> I tell you what I did about the discrepancies [in the testimony]. I didn't hide them from you. Remember, there are only three people in this courtroom that knew what all the witnesses were going to say. Remember they all met with the government.

> I knew Michael Walker believed this. I knew Tracy Washington denied it. I let it all hang out. I certainly could have said, well, Tracy, don't you think that maybe you took it. No. Don't do that. I don't hide it from you. Good, bad, pretty, ugly. You heard it. I could have orchestrated it. That would have been wrong. Could have orchestrated it. Didn't orchestrate it. Won't orchestrate it. Didn't do it. Let it all hang out.

13

\* \* \* \*

       Witnesses are not liars, they are telling the truth.

At the time these statements were made defense counsel failed to object. Counsel now contends on appeal that the statements constitute improper vouching requiring that the defendants be given a new trial.

Because counsel failed to object at trial, our review is limited to a "plain error" inquiry under Rule 52(b) of the Federal Rules of Criminal Procedure.**6** According to the Government, no such error occurred here because the prosecutor's statements did not lead to a miscarriage of justice or substantial prejudice to the defendants. As for Dorsey and Grover, we agree that the vouching did not amount to plain error because ample evidence of guilt exists independent of the vouched-for testimony to warrant the conclusion that their convictions were permissibly obtained. As for Harris, our analysis must be more detailed because the evidence against him primarily came from the testimony of Washington and Walker. Nonetheless, we conclude that the prosecutor's statements did not deprive Harris of a fair trial, and we therefore decline to reverse his conviction under Rule 52(b).

In United States v. Olano, 113 S. Ct. 1770, 1776-78 (1993), the Supreme Court defined plain error under Rule 52(b) as (1) error (2) that is plain and (3) affects substantial rights. The Supreme Court also made clear that because it is the defendant who has failed to make a timely objection at trial, it is the defendant who bears the burden of persuasion with respect to prejudice. Id. at 1178. In addition, because Rule 52(b) is permissive, a reviewing court should exercise its discretion to correct such an error only when the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 1779 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)); see United States v. Floresca, 38 F.3d 706, 712 (4th Cir. 1994) (en banc). Accordingly, we must not take the prosecutor's

_____

**6** Rule 52(b) provides that:

       Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

statements in isolation, but rather, "we must review the entire proceedings to see if the misconduct undermined the trial's fundamental fairness." United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995) (citing United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)); see United States v. Young, 470 U.S. 1, 16 (1985). **7**

Likewise, with respect to claims of prosecutorial misconduct (of which vouching is a subset), a defendant "must show that the remarks were improper and that they "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.'" Adam, 70 F.3d at 780 (quoting Mitchell, 1 F.3d at 240); see United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994), cert. denied, 115 S. Ct. 950 (1995); United States v. Brockington, 849 F.2d 872, 875 (4th Cir. 1988). There are several factors relevant to the determination of prejudice, including:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Adam, 70 F.3d at 776 (quoting United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983), cert. denied, 466 U.S. 972 (1984)). Courts should also determine whether the remarks were invited, Young, 470 U.S. 1, 12-13, and examine the remedial effect of any curative instruction provided at trial. See Harrison, 716 F.2d at 1053. See also United States v. Valez, 46 F.3d 688, 691 (7th Cir. 1995) (citing Darden v. Wainwright, 477 U.S. 168, 182 (1986)); Mitchell, 1 F.3d

_____

**7** Although the Government argues that plain error should not be corrected unless it results in a miscarriage of justice, to the extent that such a standard requires the showing of actual innocence, the law is to the contrary. Olano, 113 S. Ct. at 1779 ("The Court of Appeals should no doubt correct a plain forfeited error that causes the conviction or sentencing of an actually innocent defendant, but we have never held that a Rule 52(b) remedy is only warranted in cases of actual innocence.") (emphasis in original; citation omitted).

15

at 242-43. Again, the overriding issue is whether the prosecutorial misconduct denied the defendant a fair trial.

1.

In this case, there is no question that the prosecutor's statements are clear, unequivocal examples of vouching for the credibility of Government witnesses. Indeed, it is hard to imagine some other purpose for the prosecutor telling the jury that: "I am going to make a pitch to the judge at sentencing. [The witnesses] testified truthfully, they upheld their end of the bargain, and I am going to uphold my end of the bargain. I respect that." "I am telling you they are bad, but they are not liars. Too much to lose to lie." The"[w]itnesses are not liars, they are telling the truth."

Furthermore, the prosecutorial remarks in this case did not stop at merely seeking to vouch for the credibility of the Government witnesses. The prosecutor specifically called the jury's attention to his own credibility, arguing that he would not "orchestrate" the witnesses' testimony: "Remember, there are only three people in this courtroom that knew what all the witnesses were going to say. Remember they all met with the government." "I don't hide it from you. Good, bad, pretty, ugly. You heard it. I could have orchestrated it. That would have been wrong. Could have orchestrated it. Didn't orchestrate it. Won't orchestrate it. Didn't do it. Let it all hang out."

Taken together, the potential effect of statements of this kind are twofold. First, they tell the jury that it does not need to determine the credibility of the Government witnesses because the prosecutor has already independently determined that "they are not liars." And second, they tell the jury that in order to disbelieve the Government witnesses it must also disbelieve the prosecutor because he (the prosecutor) "[d]idn't orchestrate it."

We think that it is indisputable that the prosecution's statements were improper and amount to error that is plain. See, e.g., United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir. 1993) ("Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness."); United States v. Roberts, 618 F.2d

16

530, 537 (9th Cir. 1980) ("The prosecution may not portray itself as a guarantor of truthfulness"). We must therefore turn to the question of whether the prosecutor's vouching deprived Harris of a fair trial.

2.

We emphasize at the outset that the vouching in this case was both isolated and invited to the extent that it was in response to credibility attacks made on the Government witnesses during the course of the trial. Indeed, the vouching encompassed only a small portion of the prosecutor's entire closing argument to the jury and the thrust of that argument was that the evidence presented at trial established the defendants' guilt beyond a reasonable doubt. See Adam, 70 F.3d at 780 (no plain error when, among other things, comments were isolated); United States v. Bethancourt, 65 F.3d 1074, 1080 (3d Cir. 1995) (no plain error when prosecutor's remarks were isolated and marginal comments in the course of a short rebuttal summation), cert. denied, 116 S. Ct. 1032 (1996).

Moreover, counsel for Harris was able to respond to the prosecutor's statements in her closing argument. In particular, counsel for Harris argued to the jury that:

> The government has told you, and [the prosecutor] told you, that these witnesses don't lie. He even told you that he personally respects Tracy Washington, personally respects him. And he wants you to accept their plea bargains as a government warranty that they won't lie.
>
> Ladies and gentlemen, this is a warranty that those scorpions are not going to sting you. If the government gave you a piece of paper and said this is your warranty that a scorpion will not sting you, would you pick up that scorpion and put it in your hand? Would you trust this paper to protect you from being stung by a scorpion? If you would not pick it up, if you would not pick up a scorpion, then don't let it sting Christopher Harris.

Thus, defense counsel was able to make a direct challenge against the prosecutor's statements and to turn the statements to Harris's advantage. This served to minimize any prejudice.

17

Likewise, the district court's general instructions to the jury helped minimize any prejudice that the Harris may have suffered. As the district court judge told the jury:

> In deciding the facts, you must rely upon your own recollection of the evidence. What the lawyers have said in their opening statements and what they will say in their closing arguments, what they have said in their objections or their questions is not evidence.

The district court judge also instructed the jury to "examine the testimony of a cooperating witness with caution and weigh it with great care." While we think that general instructions of this kind do not automatically cure any prejudice that resulted from improper prosecutorial remarks, such instructions do make clear to the jury that it--not the prosecutor--must weigh the evidence.**8**

We also think that the evidence of guilt offered against Harris was substantial, even though it was not as great as the evidence offered against either Dorsey or Grover.**9** As we have discussed, a key point of contention at trial was whether Harris was the "post office" referred to by Washington and Walker in their July 1993 conversation about

_____

**8** Of course, because defense counsel failed to object to the prosecution's improper remarks, the district court judge did not provide a specific curative instruction to the jury.

**9** The evidence against both Dorsey and Grover was compelling even in the absence of the vouched-for testimony. For instance, Dorsey was recorded on video tape selling crack cocaine to Walker. As for Grover, he was arrested while carrying $154,000 in drug proceeds. The improper vouching did not therefore deny Dorsey and Grover their right to a fair trial.

18

drugs. At trial both Washington and Walker testified that Harris was the "post office," and, accordingly, the jury could reasonably believe this to be true. Nonetheless, the essence of Harris's claim of prejudice is that the jury may have relied upon the vouching of the prosecutor to reach the conclusion that Washington and Walker were not liars and that Harris was the "post office" discussed in their conversation.

However, having reviewed the record in this case, it is clear that evidence was presented to the jury from which it could find that Harris was the "post office" even absent the testimony of Washington and Walker. In the June 1993 telephone conversation between Washington and Walker, Harris was driving the car when Walker asked Washington if he had the "mailman" with him and Washington responded that he did. Washington and Walker then joked about how "Chris" (i.e., Christopher Harris) drives like a mailman. From this undisputed evidence, the jury could reasonably infer that Harris was not only the "mailman" but that he was also the "post office" discussed in the July 1993 conversation, and the jury could make this inference even without relying upon the testimony of Washington and Walker.**10**

_____

**10** The text of the June 1993 conversation between Washington and Walker was:

| WASHINGTON: | (Talking to someone in the background) . . . up on the beltway. Hun? Oh yea (inaudible) . . . right here. Need to go right here? (Inaudible) on the beltway and get off on Liberty. |
|---|---|
| WALKER: | What you got the mailman with you? |
| WASHINGTON: | Yeah. |
| WALKER: | Yeah. |
| WASHINGTON: | He can't drive worth a [expletive deleted]. He drive like a God damn mailman. You know what I mean? Hey, my uh, he drive like a God damn mailman. |
| WALKER: | What? Tell Chris supposed to drive that like he drive the Z. |

19

In sum, we hold that based on the evidence presented against Harris, the limited nature of the prosecutor's vouching, defense counsel's responsive argument to the jury, and the general instructions provided by the district court judge, Harris has failed to meet his "burden of persuasion with respect to prejudice." Olano , 113 S. Ct. at 1178. When the record is considered as a whole, Harris simply was not deprived of a fair trial. He therefore cannot rely upon Rule 52(b) to excuse his failure to object to the prosecutor's vouching.

We emphasize, however, that the Government should not take this decision as a license to resort to argument such as that made by the prosecutor in this case. Even though Harris cannot satisfy his burden under Rule 52(b), the prosecutor's vouching was simply improper.

C.

Harris also claims that it was error for the district court to refuse his request that the jury be instructed that a mere buyer-seller relationship is insufficient to establish a conspiracy and an individual's participation in it. While we agree with the premise, we disagree with its application in this case.

Throughout the trial Harris's defense was that the Government witnesses were lying and that he had absolutely no involvement in the charged conspiracy. He took the stand in his own defense and claimed that he never purchased or sold any drugs, in any quantities, from or on behalf of either Washington or Walker. That is, he did not urge the jury to find him innocent of the conspiracy charge because he merely purchased drugs from Washington and Walker.**11**

_____

**11** Harris's testimony is explicitly clear:

> Q. Chris, have you ever bought cocaine from Tracy Washington?
>
> A. No.
>
> Q. Have you ever been given cocaine by Tracy Washington?
>
> A. No.
>
> Q. Have you ever been given cocaine by Michael Walker?

20

In keeping with this defense, counsel for Harris did not request a "buyer-seller" instruction.**12** However, during the first day of jury deliberations, the jury requested guidance on whether the act of distribution is necessary to establish a conspiracy. The jury also asked for the definition of the word "participation" as it relates to the charge of conspiracy. Counsel for Harris then requested that the district court provide an instruction explaining that a mere buyer-seller relationship does not constitute evidence to support a conviction for conspiracy. The district court refused.**13**

_____

A. No.

Q. Have you ever sold cocaine?

A. No.

. . .

Q. Did you ever help Tracy Washington sell cocaine?

A. No, I didn't.

Q. Did you ever sell cocaine for Tracy Washington?

A. No, I have not.

**12** A buyer-seller instruction informs the jury that the mere purchase and sale of narcotics is standing alone insufficient evidence upon which to establish a conspiracy to distribute narcotics. See United States v. Mills, 995 F.2d 480, 485 & n.1 (4th Cir.), cert. denied, 114 S. Ct. 283 (1993).

**13** Instead, the court instructed the jury that:

A conspiracy is an agreement, knowingly and voluntarily entered into to commit an illegal act. Thus, it is the agreement itself that is illegal.

The object of the conspiracy need not be carried out for the conspiracy to exist. In count one of the indictment, the conspiracy charged is an agreement to distribute cocaine or cocaine base. Thus, to prove a defendant guilty the government must establish beyond a reasonable doubt that the defendant in question joined a conspiracy and that the defendant understood the objective of the conspiracy joined was to distribute cocaine or cocaine base. But the government need not prove that cocaine or cocaine base was actually distributed as part of the conspiracy.

21

On appeal the Government argues that the court properly refused to give the requested instruction because (1) Harris never advanced the "buyer-seller" defense at trial and (2) the district court's conspiracy instruction substantially covered the point. In light of the facts in this case, we agree with the Government on both arguments.

A district court's decision not to give a requested instruction is reviewed for abuse of discretion, and a district court's refusal to provide a requested instruction constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important that failure to give the instruction seriously impaired the defendant's ability to conduct his defense. United States v. Lewis, 53 F.3d 29, 32 (4th Cir. 1995); see United States v. Gray, 47 F.3d 1359, 1369 n.13 (4th Cir. 1995) ("Although the district court may provide an instruction if the evidence supports it, a defendant is not entitled to a particular instruction unless he or she advances the relevant theory at trial.") (emphasis in original; citation omitted).

As we have explained, Harris did not urge the jury to find him innocent of the conspiracy charge because he merely purchased drugs from Washington or Walker. Accordingly, even though the requested buyer-seller instruction is correct as a matter of law, the district court did not abuse its discretion when it refused to provide the instruction.

Also, because the testimony of Washington and Walker showed that Harris received distributable quantities of drugs on a regular basis, we agree that the district court's conspiracy instruction substan-

_____

As for the definition of the word "participation," the court instructed the jury that:

> A defendant with an understanding of the unlawful character of the conspiracy must have intentionally engaged, advised or assisted in it for the purpose of furthering illegal undertaking. He thereby becomes a knowing and willing participant in the unlawful agreement, and he must become a participant by intentionally engaging, advising or assisting in the conspiracy for the purpose of furthering the illegal undertaking.

22

tially covered the point. See Mills, 995 F.2d at 485 (no error when district court refused to give buyer-seller instruction because evidence showed that defendant was far more than a mere buyer). Indeed, we noted in Mills that evidence of a buy-sell transaction, when coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were co-conspirators. 995 F.2d at 485 n.1. Cf. United States v. Townsend, 924 F.2d 1385, 1394 (7th Cir. 1991) ("The mere purchase or sale of drugs (even in large quantities) does not demonstrate an agreement to join a drug distribution conspiracy"). Accordingly, it was not an abuse of discretion for the district court to refuse to give the buyer-seller instruction in this case.

IV.

Charles Grover has also appealed his sentence. He claims that the district court erred when it refused to grant a reduction of his sentence under section 3B1.2(b) of the Sentencing Guidelines because, according to Grover, he was a minor participant in the drug conspiracy. In addition, Grover claims that the district court erred when it adjusted his sentence upward under section 2D1.1(b)(1) of the Sentencing Guidelines based on the firearms discovered at Grover's residence upon his arrest in August of 1993. We reject both of Grover's claimed sentencing errors.

A.

The defendant bears the burden of proving by a preponderance of the evidence that he is entitled to a reduction in sentence. United States v. Nelson, 6 F.3d 1049, 1058 (4th Cir. 1993), cert. denied, 114 S. Ct. 2142 (1994). And because a defendant's role in the offense is a factual question, we review a sentencing court's decision to deny a reduction in sentence for clear error. United States v. Reavis, 48 F.3d 763, 768-79 & n.1 (4th Cir.), cert. denied, 115 S. Ct. 2597 (1995); 18 U.S.C. § 3742(e).

Under section 3B1.2 of the Sentencing Guidelines, a sentencing court may reduce the offense level of a "minimal" or "minor" participant in a conspiracy. Subsection 3B1.2(a) provides a four-level decrease in the offense level of a minimal participant. Subsection 3B1.2(b) provides a two-level decrease in the offense level of a minor

23

participant. Application Notes 2 and 3 to the Commentary of section 3B1.2 provide that:

> It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.

> For purposes of § 3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal.

Grover concedes that he was not a minimal participant in the drug conspiracy. Essentially, Grover recognizes that he does not fall within subsection 3B1.2(a) because he acted as a courier on multiple occasions carrying large amounts of drugs. However, Grover argues that because his role was limited to that of a courier and he only carried eight kilograms of the eighty kilograms of crack cocaine distributed during the course of the conspiracy, he is less culpable than other members of the conspiracy and is thus entitled to a reduction under subsection 3B1.2(b).

In United States v. Reavis, this circuit rejected a defendant's claim that she should have been classified as either a minimal or minor participant holding that courts "not only compare the defendant's culpability to that of other participants, but also `measure each participant's individual acts and relative culpability against the elements of the offense of conviction.'" 48 F.3d at 769 (quoting United States v. Daughtrey, 874 F.2d 213, 216 (4th Cir. 1989)).

Here, while Grover only acted as a courier for one tenth of the drugs distributed during the course of the conspiracy, he still carried large quantities of cocaine (eight kilograms in total), making three trips from California to Maryland. Based on nothing more than the eight kilograms that he carried, Grover knew that he was part of a large drug conspiracy. Moreover, because he carried a significant amount of drugs on multiple occasions, Grover knew that he was a

24

trusted member of the conspiracy and that he had an important <u>and</u> ongoing role in the conspiracy. Evidence that Grover's role was limited to that of a courier does not diminish the fact that he was personally responsible for the delivery of large quantities of drugs on multiple occasions. Indeed, this is not a case where the defendant carried small amounts of drugs on multiple occasions, nor is this a case where a defendant carried a large quantity of drugs on a single occasion. Therefore, we hold that the district court did not err when it rejected Grover's claim that he was a "minor" participant entitled to a reduction of sentence.

B.

The district court also properly enhanced Grover's sentence for possession of firearms during the conspiracy. Section 2D1.1(b)(1) of the Sentencing Guidelines states that "if a dangerous weapon (including a firearm) was possessed, increase by 2 levels." Application Note 3 to the Commentary provides that:

> The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in his closet.

The Government bears the burden of proving by a preponderance of the evidence that the weapons were possessed during the commission of the offense. <u>United States v. Calhoun</u>, 49 F.3d 231, 236 (6th Cir. 1995). If established, then Grover must show that it is clearly improbable that the weapons were connected with the offense. <u>Id.</u> Again, this court reviews the district court's decision for clear error. <u>United States v. Apple</u>, 915 F.2d 899, 914 (4th Cir. 1990).

In this case, three firearms were found at Grover's residence. To be specific, police found an APM 9mm semi-automatic handgun, a Colt semi-automatic handgun, an Orson semi-automatic handgun, and ammunition for all firearms. In Grover's residence, police also found tools consistent with Grover's role as a drug courier in the narcotics enterprise--that is, fabric softener, suitcases, and tape.

25

From this evidence the district court logically inferred that Grover's residence was used, at the very least, to store tools of the drug trade and that the firearms were possessed during the commission of the offense. In addition, the district court logically inferred that in his capacity as a drug courier Grover possessed the firearms to protect money or drugs while such money or drugs were kept at Grover's residence. While Grover complains that neither drugs nor drug money were found at his residence and that the Government could not point to specific instances when drugs or drug money were kept at his residence, Grover has failed to show that it is clearly improbable that the weapons were connected with the offense. Needless to say, unlike an unloaded hunting rifle, one does not possess an APM 9mm semi-automatic handgun, a Colt semi-automatic handgun, and an Orson semi-automatic handgun in order to take advantage of deer season.

V.

Based on the foregoing, we affirm the conviction and sentence of defendant Charles Grover and the convictions of defendants Charles Dorsey and Christopher Harris.

AFFIRMED